[No. 13969.   Department One.   November 8, 1917.]

JAMES C. McKNIGHT, *Trustee, etc., Plaintiff and Cross-Appellant*, v. JOHN O. SHADBOLT *et al., Defendants and Appellants.*[1]

STIPULATIONS — RATIFICATION — ACTIONS. By bringing an action for an accounting upon a stipulation for profits from mortgaged property bid in at foreclosure sale, the stipulation is ratified, and plaintiff is bound by its terms providing for payments out of the profits.

CHATTEL MORTGAGES — SATISFACTION — VALIDITY. Where chattel mortgages were given to secure advances in the operation of a ranch and for the use of personal property, and the mortgagee had the use of the personal property and repaid himself the advances out of proceeds of the crop, the mortgages fulfilled their purposes and were fully satisfied.

CORPORATIONS—INSOLVENCY. As against creditors, a corporation is insolvent when it is unable to pay its debts in due course of business.

BANKRUPTCY—PREFERENCES. Where a corporation is known to be insolvent, the transfer of personal property in consideration of

[1]Reported in 168 Pac. 473.

payment of debts due from the corporation to third persons is an unlawful preference the same as though the property had been transferred directly in payment of a debt.

Cross-appeals from a judgment of the superior court for Yakima county, H. M. Taylor, Judge *pro tempore*, entered July 14, 1916, upon findings after a trial to the court on the merits, in an action for an accounting and equitable relief. Affirmed.

*Charles F. Riddell* and *Beechler & Batchelor,* for plaintiff.
*M. A. Butler,* for defendants.

CHADWICK, J.—This action was brought by the trustee in bankruptcy of the United Cities Trustee Company against the defendants, John O. Shadbolt and Jennie Shadbolt, his wife, for an accounting, to set aside two chattel mortgages, and to recover the possession of certain personal property or its value.

While there is considerable conflict in the evidence, we find the facts to be as follows: In the fall of 1910, the defendant John O. Shadbolt traded a fruit ranch known as the Rancho Del Rio, situate in Yakima County, to the United Cities Trustee Company for an apartment house in the City of Seattle. In the trade, the ranch was valued at $65,000 and the apartment house at $55,000 above incumbrances, so that the defendant was given a second mortgage on the fruit ranch in the sum of $10,000; a first mortgage in the sum of $15,000 being put on the ranch in favor of the Netherlands-American Mortgage Bank, which sum was apparently to be used in paying off the company's debts.

In October, 1911, the company was in default in the payment of the interest on the mortgage to the bank and $2,000 of the principal then due, and was also in default in the interest due Shadbolt on his mortgage. The bank notified Shadbolt that the amount due it was unpaid and that, unless the same was paid, foreclosure proceedings would be instituted. Shadbolt took the matter up with the officials of the

United Cities Trustee Company, and was advised, according to his own testimony, by the president, "We haven't got a dollar in the world; we haven't anything to pay with now, but we have something due us from the crop." On January 25, 1912, Shadbolt paid the bank $2,585.75, being the $2,-000 and interest. Immediately thereafter, he commenced foreclosure proceedings on his own second mortgage, asking for the appointment of a receiver. In the proceedings, he made J. R. Wheat, who held a judgment against the company for $1,501.76, interest, and costs, a defendant. On January 22, 1917, while the action was pending, the parties entered into a written stipulation by virtue of which Shadbolt was placed in possession with full power and authority to deal with the same as if he were the owner, conditioned upon his cultivating and cropping the ranch during the period covered by the stipulation and advancing all sums of money required to defray the expenses of caring for the premises. He bound himself to make a full and accurate account of all income and disbursements and to disburse the net proceeds in the following order of preference:

First, in the payment of all necessary expenses incident to the care and cultivation and the work and labor employed.

Second, in the payment of the semi-annual installments of principal and interest due to the Netherlands-American Mortgage Bank on April 1, 1912, and the further sum of $2,000 maturing on the principal on October 1, 1912, with interest to October 1, 1912.

Third, to the payment of Wheat's judgment in the sum of $1,501.76 with interest and costs, and a note in favor of the First National Bank, of North Yakima; these claims to be prorated as the interests of the two creditors should appear.

Fourth, one hundred dollars per month to Shadbolt for his services, and also the sum of $397.82 evidenced by a note owing to him by the company which was not secured.

Fifth, any sum remaining to be applied in reduction of the Shadbolt mortgage debt.

The stipulation further provided that any excess bid at the foreclosure sale should be paid by the purchaser in satisfaction of the the Wheat judgment, the amount due Shadbolt on the above mentioned promissory note, and the debt owing the First National Bank.

At the same time and as a part of the same transaction, the company gave Shadbolt a chattel mortgage for $5,000 on the crop of the fruit ranch for the year 1912, and also a mortgage for $1,000 on all the personal property constituting the equipment used in the operation of the ranch. The lower court found that the purpose of both of these mortgages was to secure Shadbolt the repayment of any sums of money that he might advance in the operation of the ranch under the stipulation, and also to secure to him the use of the personal property. While there is a decided conflict of evidence on this point, we think it preponderates in favor of the lower court's finding.

Immediately after the execution of the stipulation, Shadbolt took possession of the fruit ranch. Pursuant to the stipulation, a decree of foreclosure was entered. The ranch was sold on March 9, 1912, to Shadbolt for the sum of $16,-204.42; which was $2,048.47 in excess of the amount due Shadbolt under the decree of foreclosure. This sum was used by Shadbolt in accordance with the stipulation to pay the judgment in favor of Wheat and the note due Shadbolt in the sum of $397.82.

In March, 1913, the company, apparently finding that it could not redeem the ranch, agreed with Shadbolt that, if he would pay the balance due the First National Bank, of North Yakima, on a note signed by the company and its trustees individually and two other small items owing by the company, making a total of $495, which Shadbolt thereafter paid, the title to the property covered by the $1,000 chattel mortgage should vest in him. The personal property was worth at that time about $625.

On June 7, 1913, the company was adjudged a bankrupt by the United States District Court for the Western District of Washington.

At the trial in the court below, Shadbolt gave the following accounting of the fruit ranch during the year 1912: Gross returns, $12,742.43; money disbursed in growing of crop, $10,496.14; net return, $2,246.29. The whole net return was disbursed by Shadbolt in accordance with the stipulation to the payment of the principal and interest due the Netherlands-American Mortgage Bank in April and October, 1912.

The plaintiff contends that the payment of the net returns made to the Netherlands-American Mortgage Bank was unlawful, and that Shadbolt should be held for the same in his accounting and also contends that Shadbolt should be charged with the sum of $2,048.47, being the excess amount bid by him at the foreclosure sale and applied by him to the payment of the judgment in favor of Wheat and his own note. Plaintiff also contends that the chattel mortgages were void, and that the attempted sale or transfer of the personal property to Shadbolt was void as being an attempted preference of its creditors by an insolvent corporation, within the prohibition of § 60 of the Bankruptcy Law (30 Stat. 562; U. S. Comp. St. 1916, § 9644).

The lower court held that, while the defendant had failed to account prior to the time of trial, he did fully account at the time of the trial. It set aside the chattel mortgages and gave judgment against the defendants in the sum of $625 as the value of the personal property. Both plaintiff and defendants have appealed.

Plaintiff rests his contention that defendants have not fully accounted on the theory that the net proceeds of the 1912 crop paid by Shadbolt to the Netherlands-American Bank, and the excess bid at the sale applied to the payment of the Wheat judgment and the note due Shadbolt from the company for $397.82, were preferential payments, and, also, that

Shadbolt should not be allowed the salary of $100 per month, on the ground that one who knowingly assists an insolvent corporation to prefer its creditors will be denied any compensation.

It will be sufficient to say that both of these payments and the salary of Shadbolt were provided for in the stipulation. By bringing this suit and asking for an accounting, plaintiff has elected to ratify the stipulation; for, without it, Shadbolt would have been entitled to take over the fruit ranch under his foreclosure proceeding, and, unless redemption was had, could not have been compelled to make any accounting whatsoever. Plaintiff cannot accept that part of the stipulation which seems to him most favorable, and reject the rest as invalid. He must either treat the stipulation as void *in toto*, or as valid. Having elected to treat the stipulation as valid by bringing this suit for an accounting under it, plaintiff is bound by its terms, and cannot be heard to complain of the payments made or the salary allowed under its express conditions.

It will be unnecessary to discuss the chattel mortgages further than to say that they were given by the company and accepted by Shadbolt to secure him for such advances as he might make in the operation of the ranch and to secure him the use of the personal property covered by the $1,000 mortgage during the life of the stipulation. Shadbolt has had the use of the personal property and he has repaid himself out of the proceeds of the crop for whatever sums he advanced in the operation of the ranch, so that the purposes for which the mortgages were made have been fulfilled; and whether we regard the mortgages as valid or invalid, they were fully satisfied and no longer of any effect.

The next question to be considered is whether the lower court erred in entering judgment against the defendants for the value of the personal property which was turned over to Shadbolt by the officials of the company in consideration of

his payment of the amount due the First National Bank of North Yakima, and the two other small accounts.

It is plainly apparent from the record that the company was insolvent at the time of this transaction under the decisions of this court.

"The evidence plainly shows that it was insolvent in that it was not able to pay its debts in due course of business, and this is the test of insolvency adopted by this court where the rights of creditors are involved." *Nixon v. Hendy Machine Works,* 51 Wash. 419, 99 Pac. 11.

See, also, *Ronald v. Schoenfeld,* 94 Wash. 238, 162 Pac. 43; *McKay v. Sperry Flour Co.,* 95 Wash. 209, 163 Pac. 377.

It is obvious that, if the property had been transferred directly to Shadbolt in payment of a debt due him, the transaction would constitute a preference and that the trustee would be entitled to recover the property or its value. *Benner v. Scandinavian-American Bank,* 73 Wash. 488, 131 Pac. 1149, Ann. Cas. 1914D 702; *Ronald v. Schoenfeld, supra.* The effect on the other creditors is the same whether Shadbolt took the property in payment of his own account, or on his agreement to pay a debt due another. The assets of the corporation were depleted to the same extent. The effect would have been the same if Shadbolt had paid the debts, taken assignments of them and used these assignments as a payment to the company for the chattels turned over to him. This would clearly have been a preference. We think that the fact that Shadbolt paid the debts of others and not his own will not take the transaction out of the class which are held to be void as creating a preference under § 60 of the Bankruptcy Law (30 Stat. 562; U. S. Comp. St. 1916, § 9644).

"To constitute a preferential transfer, it is immaterial to whom the transfer is made, if it be made for the purpose of paying the claim of one creditor in preference to those of others." *Hackney v. Raymond Bros. Clarke Co.,* 68 Neb. 624, 94 N. W. 822, 99 N. W. 675.

See, also, 5 Cyc. 294; Collier, Bankruptcy (10th ed.), p. 817.

We are the more inclined to this holding when we consider that the result of sustaining this sort of transaction would operate to defeat the very purpose of the bankruptcy law and would make fraud easy to perpetrate and difficult to detect.

There is no reason, either in law or equity, why a party to a preferential transaction should be protected. The evidence plainly shows that Shadbolt knew that the company was insolvent, and knew, or should be held to know, that the effect of his taking over the property of the company and paying certain creditors was to prefer them over the remainder of the creditors.

In *Walters v. Zimmerman*, 208 Fed. 62, an insolvent was indebted to a bank. He gave a mortgage to Marsh, the president of the bank, personally, and received from him a personal loan of $12,000 with the understanding that this money should be applied in payment of the bank's account. This was done. The trustee in bankruptcy of the insolvent later brought an action to set aside the mortgage as a preference. The court held that the mortgage was a preference and voidable, quoting with approval the following from *In re Beerman*, 112 Fed. 663:

"If transactions of this sort are to be permitted, then, instead of a creditor taking a mortgage himself, when a debtor is in failing circumstances, he will get some one else to advance the money, agreeing that the person advancing the money shall suffer no loss, and thereby obtain by indirection a preference which he would be unable to get if he had acted directly with the debtor, provided, of course, that the debtor within four months thereafter becomes a bankrupt."

The rule is obviously the same whether the title to the property or a lien thereon is attempted to be transferred. While there is authority to the contrary (*In re Hersey*, 171 Fed. 1004), we think the weight of reason is with the cases just

cited. See, also, *In re Wright Lumber Co.*, 114 Fed. 1011; *Lumpkin v. Foley*, 204 Fed. 372.

The judgment of the lower court is affirmed. No costs on appeal will be allowed either party.

ELLIS, C. J., MORRIS, MAIN, and MOUNT, JJ., concur.